UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────────────┐
```

TIMO PLATT, AND GORDON PLATT, *as co-trustees of the Platt Family Artwork Trust,*

               Plaintiffs,

        *– against –*

ALLEN MICHAAN,

              Defendant.

**<u>OPINION & ORDER</u>**

19-cv-4234 (ER)

<u>Ramos, D.J.:</u>

       This case concerns two paintings by the renowned artist Louis Comfort Tiffany ("Tiffany")[1]—"Market Day at Nuremberg,"[2] and "In the Fields at Irvington"[3] (the "Paintings"). Tiffany's great-great grandsons, Timo and Gordon Platt ("Plaintiffs"), as co-trustees for the Platt Family Artwork Trust (the "Trust"), brought this action against Allen Michaan ("Michaan") to recover the Paintings. Plaintiffs allege that the Paintings are subject to an anti-alienation restriction that required that they remain in the Platt family in perpetuity. Michaan alleges that he purchased the Paintings from a member of the Platt family who had title to the Paintings. Plaintiffs and Michaan both move for summary judgment. For the reasons set forth below, Plaintiffs' motion for summary judgment is DENIED and Michaan's motion for summary judgment is GRANTED.

---

[1] Tiffany died in 1933 at the age of 84. *Louis Comfort Tiffany,* https://morsemuseum.org/louis-comfort-tiffany/ (last visited Sep. 7, 2023).

[2] This Painting is referred to as "Market Day at Nuremburg" in the Complaint and is registered under the same name. Doc. 1 ¶ 1; Doc. 165-10 at 3. However, the parties' Rule 56.1 Statements, Henry Platt's revocable trust, and Internal Revenue Service ("IRS") refer to it as "Marketplace at Nure[m]burg." *See* Doc. 149-51 at 9; *see also* Doc. 149-25.

[3] This Painting is referred to as "In the Fields *of* Irvington" in the Complaint. Doc. 1. ¶ 1 (emphasis added). However, it is registered as "In the Fields *at* Irvington," Doc. 165-9 at 3, and referred to as "In the Fields at Irvington" by Timo and the IRS. *See* Timo Tr. at 160:9–16; *see also* Doc. 149-25 at 6.

I.    **BACKGROUND**[4]

   **A. Factual Background**

   *1. The Parties and Possession of the Paintings*

   The two Paintings had been in the possession of Tiffany's granddaughter, Louise Platt

("Louise"), until her death in February of 1994.  At that time, the Paintings were transferred to

Louise's three sons—Henry Platt ("Henry"), Thomas Platt ("Thomas"), and Graham Platt

("Graham") via Louise's will.  Doc. 1 ¶ 10.  The Second Article of Louise's will states, in

relevant part:

> SECOND:  I give and bequeath all my tangible personal property, including
> animate chattels, wherever situated together with any insurance policies relating
> thereto, to my husband, COLLIER PLATT, if he survives me, or if he does not
> survive me, then equally to such of my children as survive me [*i.e.*, Henry, Thomas
> and Graham], to be divided among them as they shall agree or, should they fail to
> agree upon such division, then as my Executor [Thomas], in his absolute discretion
> shall determine.

Doc. 149-8 (Louise's will).  Plaintiffs admit that the will does not expressly create an anti-

alienation restriction, but assert that the Paintings are not subject to the will.  Michaan disputes

this.  Louise's husband, Collier Platt, did not survive her, and his will also did not have an anti-

alienation restriction for the Paintings.

   Thomas sent a letter to Henry and Graham on May 20, 1994 (the "1994 Letter") in his

capacity as Executor of Louise's will.  Plaintiffs allege that the 1994 Letter "demonstrates

conclusively" that there was an anti-alienation restriction concerning the Paintings.  Doc. 163 at

15.  The 1994 Letter provides as follows:

> Under… Mother's Will, all of her tangible personal property is bequeathed
> equally to the three of us to be divided among us as we shall agree or, should we

---

[4] The following facts are drawn from the parties' Rule 56.1 statements, Docs. 147-1, 156, 161, 164, supporting
exhibits, and pleadings, and are undisputed unless noted otherwise.

fail to agree upon such division, then such division shall be made as her Executor "in his absolute discretion" shall determine…

Notwithstanding any tentative allocations which may have been made over twenty years ago or any processes enabling Mother to start making gifts to us and to the children to remove items from her estate, the fact is that no such gifts or allocations were made by her and the discussions with respect to the same are not legally or morally binding on anybody now.  The tangible personal property was hers to bequeath then, was hers at the time she made her Will in 1982 and was hers at the time of her death and her Will governs the division.

The term "equally," as I read it, means monetarily equally.

Harry[5] has expressed to me a preference for at least two, if not more, Tiffany paintings (the Nuremberg and the Algiers).  I think if we are going to agree upon preferences of this sort, we are going to have to make the preferences, subject to anti-alienation agreements to any person outside of an immediate family member both during life and at death, i.e. restrict them to life estates with the redivision being made to present members of the class surviving at the termination of the life estate.  Absent such agreements…. I will in my absolute discretion, determine the division.

I think this is the only fair way for everybody, particularly those who may survive for the next 50 years or so, and I think we have to proceed on this basis.

Hoping you agree.

Doc. 162-3 ("1994 Letter").  The letter is not signed by Thomas.  Plaintiffs do not know anyone who ever observed Thomas create, sign, or send the 1994 Letter.  Timo Tr. at 176:18–178:6; Gordon Tr. at 40:16–41:21.  However, in his February 1, 2023 sworn declaration, Timo stated that he has "personal knowledge" of the copy of the 1994 Letter and that he "read this letter back in 1994."  Timo Decl. ¶¶ 13, 15.  He stated that the letter was prepared by his father Thomas in May 1994 following the death of Thomas' mother Louise, and in connection with the division of custody of the Tiffany paintings, including the Paintings.  *Id.* ¶ 13.  He also stated that the 1994 Letter was sent to and received by Henry and Graham; that it was created using carbon paper in a manual typewriter; and that it is a duplicate of the original sent by Thomas.

---

[5] Henry Platt was also referred to as Harry by the Platt family.

*Id.* ¶ 14.  According to Timo, the carbon copy was not signed because that was "the ordinary practice at the time."  *Id.*

There is no evidence that there was a written response to the 1994 Letter.  Timo Tr. at 29:24–30:7 (Q. Did you ask your father whether there was anything in writing that confirmed the anti-alienation restrictions?  A. I knew about the 1994 [L]etter.  I did not ask him about further written documentation … it was not necessary."  Gordon testified during his deposition that the 1994 Letter reflects that, "if [Henry, Graham and Thomas] did not agree to the anti-alienation restriction, that my uncle [Thomas] would exclusively decide what was to be done with the artwork."  Gordon Tr. at 46:17–25.

Thomas and Graham engaged Alastair Duncan ("Duncan") in 1994 to appraise all of the Tiffany art owned by Louise, including the Paintings.  Duncan Tr. at  9:22–24:14, 26:11–27:19, 29:25–32:18 (Doc. 149-12); Doc. 149-25 at 6 (listing the fair market value of "Marketplace at Nurenberg" [*sic*] and "In the Fields at Irvington" as $45,000 each); Doc. 149-24 (December 4, 1995 Letter to Duncan from Thomas discussing negatives for a photograph, on United States District Court letterhead)[6]; Doc. 149-26 (April 15, 1997 Payment of invoice to Duncan from Thomas, on United States District Court letterhead); Doc. 149-35 (April 22, 1999 Payment of invoice to Duncan from Thomas, on United States District Court letterhead).

In his role as Executor, Thomas oversaw a federal estate tax filing for Louise's estate, in which he attested under penalty of perjury that Louise, at the time of her death, "own[ed] … articles of artistic or collectible value in excess of $3,000," specifically identifying "Tiffany … works of art, as appraised by J. Alastair Duncan, Ltd."  Doc. 149-11 at 15 ("Louise Estate Tax Return").

---

[6] Thomas was, at all times relevant to this matter, a United States District Judge for the Eastern District of New York.

When the IRS contested Duncan's Tiffany art valuations of the Paintings as too low, Thomas retained legal counsel to challenge the IRS's finding.  Doc. 149-25 at 2, 5–6 (IRS Fair Market Value Conclusion Letter and Letter from LeBeouf, Lamb, Greene & MacRae law firm to the IRS).  During this three-year dispute, Thomas never claimed that there was an anti-alienation restriction governing the two Paintings.  Timo conceded at his deposition that an "anti-alienation restriction, if taken into account, would have an impact upon the taxable value of the assets in question" and would mean "[t]here was no market for the paintings because the paintings were not capable of being sold," thereby resulting in "a deduction from the taxable value" according to "the taxpayer's position."  Timo Tr. at 98:2–15, 106:14–107:5, 206:16–208:8, 215:16–216:3, 217:23–218:16; *see also* Docs. 149-36 (correspondence between Timo and an appraiser discussing impact of an anti-alienation restriction on market value).

  a.  *Henry's Possession*

The Paintings were then in Henry's possession from 1994 until they were sold to Michaan in April 2011 for the aggregate sum of one million dollars.  Michaan is an auction house owner and a collector of art created by Tiffany.  The Plaintiffs are Henry's nephews— Timo is Thomas' son and Gordon is Graham's son.

Henry received care from a nurse seven days a week for 12 hours a day starting in approximately 2008 until his death on July 22, 2015, at the age of 91.  Wathne Tr. at 179:6–8, 190:24–25, 261:2–12 (Doc. 162-16).  Henry's longtime companion, Thorunn Wathne ("Wathne"), testified in her deposition taken on September 14, 2022, that Henry's health began to decline in 2014.  *Id.* at 185:4–20.  Plaintiffs allege that Henry was incompetent at an earlier point in time—by 2007 or 2008—and that if Henry "knowingly and voluntarily [] transferred the

two Paintings … he did so when he was not competent."  Timo Tr. at 166:11–167:10; *see also*

Doc. 156 ¶ 77 (Pls' Opposition to Def's Rule 56.1 Statement)

Plaintiffs offer no documentary evidence regarding Henry's competency.[7]

Timo and his father Thomas expressed concerns about Wathne and the Paintings as early

as 2008.  For example, in his deposition taken September 12, 2022, Timo testified that by 2008

Thomas began to be concerned that Wathne "would object to being told … that the [anti-

alienation] restrictions existed" with respect to the two Paintings, and that she might "force a

confrontation over" the issue.  Timo Tr. at 80:11–19.

In a letter dated February 19, 2008 and addressed to Thomas, Henry referenced a

conversation that Timo had with Henry's lawyer, Helen Chaitman.  *See* Doc. 165-12 (the "2008

Letter").  In relevant part, Henry stated that he believed Thomas was interested in taking control

of Henry's assets and that the Platt family was concerned Thorunn would steal the assets.  Henry

wrote:

> My lawyer, Helen Chaitman, informed me of her conversation yesterday with Tim.[8]
> I have always been very fond of Tim and I can only assume that the misinformation
> he gave Helen came from you … We have never been close and, in my opinion, you
> simply perceived an opportunity–because I was not well–to take control of my
> life and my assets …. don't come forward now pretending to be my protector when
> you are simply trying to grab control of my assets for your own enrichment …. Tim
> told Helen that mother gave me the paintings of our grandfather in trust for the
> family.  Again, I'm sure you told this to Time but you know this to be a lie.  Mother
> gave me the paintings because she wanted me to have them and I am free to do with
> the paintings whatever I want …. Tim told Helen that "the family" is concerned
> that Thorunn will steal my assets and use them for her own purposes.  If this is a
> concern you voiced to Tim, it is surely because this is your desire … I am convinced
> that your sudden interest in me is solely the result of your desire to take control of
> my assets …. I did take some paintings out of my apartment because I was
> concerned that you would use the phony power of attorney to break into my

---

[7] It is undisputed that Henry was an established public figure.  He was a graduate of Yale University; a naval officer in World War II; a noted gemologist; and the president of Tiffany & Co.

[8] When asked if he goes by "Tim," Timo testified that Henry referred to him as "Timmy," Timo Tr. at 195:24–196:2, but did acknowledge that the letter was referring to him.

apartment and steal the paintings.  I wanted to put them someplace where you could
not steal them.

Doc. 165-12 (February 19, 2008 Letter from Henry to Thomas); *see also* Doc. 168 at 24 n.13.

The letter is on "Henry B. Platt" letterhead and signed "Harry."[9]  In his deposition, Timo

confirmed he did have a conversation with Chaitman before February 19, 2008.[10]  Timo Tr. at

196:8–14.  Timo also testified that the doorman at Henry's apartment in New York City

observed artwork being removed from the apartment and that his father asked him to raise the

question with Henry and that "[they] were concerned about that report."  *Id.* at 198:4–21.

However, Timo testified that the concerns were allayed when "[Henry] told us that the artwork

had not been removed."  *Id.* at 198:22–25.

Beginning with Henry's death in July 2015, Timo testified that his "repeat[ed]" calls and

emails to Wathne "at regular intervals … [e]very few months," to ascertain what Tiffany art

Henry still possessed at the time of his death went unanswered.  Timo Tr. at 160:19–162:4,

164:4–165:2; Timo Decl. ¶ 21.  Timo left messages "that referenced the restrictions against

transfer of the two Paintings and other Tiffany artwork," but does not elaborate on the exact

contents of these messages.  Timo Decl. ¶ 21.

b.  *Michaan's Purchase of the Paintings*

Michaan purchased the Paintings from Henry in April 2011 through an intermediary,

Duncan,[11] who in addition to having appraised Louise's art in 1994, had worked with, and knew,

---

[9] Plaintiffs do not comment on or dispute the authenticity of this letter.  *See generally* Doc. 169.

[10] The first time Timo saw or heard of this letter was after this litigation began.  Timo Tr. at 97:7–16.

[11] Michaan was aware that Duncan had been convicted of a felony by a jury in 1999 for conspiring with a grave
robber to re-sell a Tiffany window from a graveyard.  Duncan Tr. at 103:9–25; 162:23–164:7 (Doc. 162-9).  Duncan
testified in his deposition taken on October 6, 2022, that he ran a check with the Art Loss Society (also known as the
Art Loss Register, which is a database utilized as a "due diligence service to clients in the art market who wish to
ensure that they are working with items to which no claim will arise") on the Tiffany window, and that he proceeded
to sell it because the Art Loss Society said that the window was not listed as stolen.  *Id.* at 164:18–23.  Duncan

both Michaan and Henry for years.[12]  Michaan paid for the two Paintings through a wire transfer

to a woman named Diane Krantz ("Krantz"), who was designated as Henry's representative.

Krantz Tr. at 52:14–53:10.  In his deposition taken on September 13, 2022, Michaan testified

that he did not meet or communicate with Henry before purchasing the two Paintings, but rather

had a social meeting with Henry and Wathne in May 2011 in Palm Beach, Florida—a month

after the sale of the Paintings.[13]  Michaan Tr. at 28:9–16, 43:11–21.[14]

The invoice from the sale of the Paintings acknowledged that the Paintings "have

remained in the [Platt] Family since their creation," but nevertheless stated that Henry "holds

clear title to [the Paintings]."  Doc. 162-7 (Invoice).  Michaan testified that he did not conduct

any due diligence and "trusted the seller [] since [the two Paintings were] coming directly from

---

maintains his innocence and that the prosecutor in the case coached the man from whom he bought the stolen Tiffany window into perjuring himself.  *Id.* at 165:2–5; *see also* THE ART LOSS REGISTER, bit.ly/3squ8vt (last visited Aug. 23, 2023).

[12] As noted above, Duncan also conducted the appraisal of Louise's estate in 1994.

[13] The Court notes that during a conference held on July 7, 2021, Michaan's counsel represented that "Mr. Michaan did meet with Henry Platt and with Ms. Wathne … and negotiated purchase in person, at a meeting that took place in Florida, is my understanding."  Doc. 72 at 8:13–16.

[14] On December 15, 2022, Michaan submitted a signed, sworn errata sheet to his draft deposition transcript changing his response from "yes" to "no" to the question of whether the meeting took place in the same year as the transaction (line 19 below).  Doc. 162-8.  However, on March 3, 2023, in a sworn declaration, Michaan's counsel reported to the Court that line 21 is the line that should have been changed from "yes" to "no."  Doc. 166.  Thus, Michaan's testimony is that the meeting did take place in the same year as the transaction.

> 14 Q. For that social meeting, do you recall
>
> 15 what time of year it was?
>
> 16 A. I believe it was May.
>
> 17 Q. Was it in the same year of the
>
> 18 transaction?
>
> 19 A. Yes.
>
> 20 Q. Or was it later?
>
> 21 A. Yes.

Michaan Tr. at 43:14–21.

Henry Platt, as a direct descendant of Louis Tiffany ….”  Michaan Tr. at 51:16–21.  Michaan did

not ask Duncan for written evidence of Henry's ownership of the Paintings, if the Paintings were

subject to liens, if there were any transfer restrictions, or inquire about information in the Art

Loss Register.  *Id.* at 52:2–24, 54:5–8.

 Michaan testified he “had no reason, whatsoever, to disbelieve any right that [Henry] had

to dispose of his own property.”  *Id.* at 56:9–11.  The two Paintings were not registered with the

Art Loss Register until September 26, 2018 and February 4, 2019, respectively, well after the

sale to Michaan was made in April 2011.  Timo, as co-Trustee of the Trust, registered “In the

Fields at Irvington” on September 3, 2018, with the Art Loss Register stating that the Painting

was “missing” and “ha[d] not been located or accounted for since” Henry's death in 2015 and

that “[t]here are rumors … that the painting may have been sold (in breach of the no-transfer

restriction) by a purported agent, some time after [] 2003 but prior to [Henry's] [death], but the

Trust has not received or identified any firm evidence of any such sale/transfer.”  Doc. 165-9 at

3–4.  On September 26, 2018, the Art Loss Register confirmed the Painting was registered in the

database.  *Id.* at 1.  Likewise, Timo sought to register “Market Day at Nuremberg” on February

1, 2019, stating that “to our knowledge, there is no pending or proposed sale.  Instead, we had

simply received information suggesting that the custodian or agent might be considering offering

the painting for sale.”  Doc. 165-10 at 3.  Timo also stated that the Painting was “subject to the

restriction that it may not be sold or transferred outside the family, which restrictions are now set

forth in the family trust that owns the artwork.”  *Id.* at 4.  The Painting was registered on

February 4, 2019.  *Id.* at 2.

 Regarding due diligence in the instant sale to Michaan, Duncan testified that he presumed

to be “dealing with the inheritance that [Henry] had received on his mother's death.”  Duncan Tr.

at 42:9–23 (Doc. 162-9).  Duncan testified that he does not recall whether anyone told him that Louise owned and inherited the Paintings.  *Id.* at 21:23–22:13.

Timo testified that the Platt family first became aware that the two Paintings were no longer in Henry's possession when his "brother saw ["Market Day at Nuremburg"] at the Lillian Nassau Gallery in New York City in The Winter Art Show on January 29, 2019" and upon the receipt of an email concerning "In the Fields at Irvington" from Alan Baseman[15] in April 2019.  Timo Tr. at 160:9–16; *see also* Timo Decl. ¶ 24.

2.  *The Anti-alienation Restriction and the Wills*

Plaintiffs sent a demand letter to Michaan on May 8, 2019 asserting that "an anti-alienation restriction and other limitations [] have governed [the Paintings] and other family artwork from the time of their creation by Louis C. Tiffany."  Timo Tr. at 68:22–69:15; *see also* Doc. 149-6 (Demand Letter).  Attached to this demand was the 1994 letter[16] from Thomas to his two brothers which Plaintiffs allege establish an "anti-alienation restriction."

Plaintiffs take the position that the alleged anti-alienation restriction is "perpetual" and "prohibits any commercial transfer" of the Paintings or other works of art by Louis Tiffany "throughout all of [the Platt] family's generations … [i]ncluding future generations."  Gordon Tr. at 132:25–133:10.  Plaintiffs admit that "there was no documentation … of any kind that concerned the descent of Louis Tiffany artwork" and Plaintiffs do not know when the alleged anti-alienation restriction first came into existence.  Timo Tr. at 49:23–50:4, 71:7–15; Gordon Tr. at 22:6–23.

---

[15] Timo testified that Baseman "identified himself as counsel to Michaan."  Timo Tr. at 68:22–69:11.

[16] Timo does not state where he found the 1994 Letter.

Timo testified in his deposition that there are three sources of his understanding the establishment of the anti-alienation restriction, Timo Tr. at 192:19–20: (1) "family tradition and family ownership; (2) the 1994 [L]etter; and (3) the agreement [that Thomas, Henry, and Graham] all confirmed to each other in distributing the artwork, including the two [P]aintings." *Id.* at 114:19–25.  As to family understanding, Timo testified that his grandmother, Louise, had this understanding based on conversations with her grandfather, Tiffany, and mother, and that the idea originated with her grandfather, Tiffany. *Id.* at 48:20–49:18.  Gordon testified at his deposition taken on September 15, 2022 that he has had this understanding through conversations with his grandmother, Louise, his father Graham, as well as uncles, grandparents, cousins, and siblings.  Gordon Tr. at 22:7–23:19.

Plaintiffs also offer the testimony of two individuals: (1) Alice Frelinghuysen, a Curator of American Decorative Arts at the Metropolitan Museum of Art (the "Met") in New York and (2) Ray Hurst, Henry Platt's financial advisor, as evidence of the existence of the anti-alienation restriction.  In her deposition taken on September 19, 2022, Frelinghuysen testified that she was surprised to see that "Market Day at Nuremberg" was for sale in 2018 because "[Henry] Platt said it was never to go out of the family" and that in 1998 Henry said that he could not donate the Painting to the Met "because it always had to stay in the family."  Frelinghuysen Tr. at 60:25–61:6, 30:16–24.  Frelinghuysen also testified that Henry "mentioned some nephews" and "seemed to know exactly who was going to be the custodians of … the [P]aintings after he passed away."  *Id.* at 70:19–23.  Hurst testified in his deposition taken on September 20, 2022, that "Platt[17] told [him] he couldn't sell those paintings" referring to "those two paintings that

---

[17] Hurst testified in relevant part:

> Q.  When you spoke with Timo Platt, did he ever use the words, quote, stay in the family or stay within the family?

were in [Henry's] apartment that [Henry] was proud of, that are to remain with his family, that were from his great, great-grandfather, whatever he is."  Hurst Tr. at 60:23–61:3; 97:17–19. Hurst could not identify which specific paintings he was referring to.  *Id.* at 61:4–5.

a.  *Henry Platt's Will*

Henry died on July 22, 2015.  It is undisputed that his will does not mention an anti-alienation restriction governing the two Paintings or any other Tiffany artwork.  Doc. 149-50 (Henry's will).  Henry's revocable trust agreement dated February 15, 2008 states that he had authorized his trustees at his death to donate one of the Paintings, "Marketplace [*sic*] at Nuremberg" to the Met, on the condition that it be displayed and not sold.  Doc. 149-51 at 9 (Henry Platt's Revocable Trust).  The revocable trust states that all remaining tangible personal property, including "articles of… ornament" were to be distributed among members of the Wathne family.

b.  *Graham Platt's Will*

Upon his death on January 25, 2016, Graham Platt provided in his will that "if [his] wife does not survive [him]" he gives his "tangible personal property in equal shares to those of [his] children[18] who survive [him]."  Doc. 149-43 at 4–5 (Graham's Will).  It is not disputed that his will does not mention an anti-alienation restriction.  Gordon Tr. at 63:7–8.  Gordon testified that

---

A.  He mentioned that.

Q.  And what did he say?

A.  I don't recall.  But you found the right words.  You found words that are close enough … And I know Platt told me he couldn't sell those paintings.  He told me he could not sell those paintings.

Hurst Tr. at 97:7–19.  It is unclear if Hurst is referring to Timo or Henry Platt.

[18] Graham's surviving children are Gordon, Christina May Nelson ("Christina"), and Graham Leghe Platt ("Graham Leghe").  Doc. 149-43 at 5.

he personally received four pieces of Tiffany artwork "after the settlement of [his] father's estate," which did not include the either of the two Paintings. *Id.* at 55:2–17.

Graham's daughter, Christina, engaged an art appraiser named Jerry Dobesh in October 2016 to provide an appraisal of the property in Graham's estate. *Id.* at 65:16–66:4; Doc. 149-44 (Appraisal of Fine and Decorative Art Works). This appraisal identified "The Estate of Graham L. Platt" as the "Owner of the Property" and that Christina stated "that the Estate of Graham L. Platt is the sole owner of [13 of 16] items." Doc. 149-44 at 5. The appraisal also reflects that Christina identified herself as "the sole owner" of the remaining three items. *Id.* Seven of the works were previously possessed by Louise, but did not include the two Paintings. Gordon Tr. at 68:16–71:6. Gordon was aware of the appraisal report and did not raise any objections.

Neither Christina nor Gordon informed Dobesh about any anti-alienation restriction. In November 2016, Christina certified "a complete inventory of all property of the estate" of Graham with the Circuit Court of the State of Oregon for the County of Lincoln ("Oregon Court"). *See* Doc. 149-45 at 2. The inventory includes five paintings and five "other art objects" by Tiffany under the "personal property" category. *Id.* at 4. In January 2018, the Oregon Court entered a general judgment approving a verified statement in lieu of final account filed by Christina, which outlined specific pieces of Tiffany art identified as "tangible personal property" of Graham's estate divided amongst each of Graham's children—Gordon, Christina, and Graham Leghe. Doc. 149-46 at 3 ("Oregon Court General Judgment"). In September 2018, Gordon had another appraisal report prepared for insurance purposes of the Tiffany works in Graham's estate and made no mention of an anti-alienation restriction that would govern the art being appraised. Gordon Tr. at 59:16–61:16.

13

Although Plaintiffs recognize that "the art work was distributed as part of [their] grandmother's will" and that Thomas, Graham, and Henry "each received about an equal number" of pieces of Tiffany artwork, they maintain that the Paintings did not pass through the estate. Gordon Tr. at 30:14–15, 42:4–5, 44:13–17; Timo Tr. at 185:6–15. Rather, Plaintiffs allege that the three brothers treated the Tiffany art as part of the Louise Platt estate to avoid lengthy and expensive proceedings with federal and state tax authorities, but that the Paintings were not subject to Louise' will because they passed outside of the estates.

   c. *Thomas' Will*

Thomas executed his will on October 23, 1996 and upon his death on March 4, 2017, bequeathed "all of [his] … paintings and other objects of art … of whatever description… to [his] wife, BYRD SYMINGTON PLATT, or, if she shall not survive [him], to such of [his] children as shall survive [him], to be divided among them as they shall agree upon in as nearly equal shares as may be practical." Doc. 149-39 at 2 (Thomas' Will). It is undisputed that Thomas' will makes no mention of the anti-alienation restriction. Thomas' wife did not survive him and her will also made no mention of an anti-alienation restriction. Thomas' sons, Timo and Charles Platt ("Charles")[19], were the co-executors of his estate.

In March 2018, the co-executors of Thomas' will, Timo and Charles, retained Christie's Appraisals, Inc., to conduct an estate tax appraisal of the property in Thomas' estate (the "Appraisal"). Doc. 149-40 (Christie's Estate Tax Appraisal for the Estate of Thomas C Platt Jr.). The Appraisal included Tiffany art that Thomas had acquired through Louise. Timo Tr. at 24:11–17. The Appraisal makes no mention of an anti-alienation restriction regarding the

---

[19] Charles initially represented the Plaintiffs in this action when he was a partner in the law firm Wilmer Cutler Pickering Hale and Dorr LLP. Doc. 1. Charles withdrew as counsel on November 7, 2019, upon his retirement from the firm. Doc. 31.

Tiffany artwork.  Timo testified that "[t]he value of the [Tiffany] artwork … was included in the value of the taxable estate reported to the tax authorities," and that the New York Department of Taxation and Finance subsequently sent a "New York State Estate Tax Closing Letter."  *Id.* at 131:8–18, 133:17–134:19, 218:17–220:12; *see also* Doc. 149-41 at 28 (Thomas Platt Estate federal tax filing); Doc. 149-42 (New York State Estate Tax Closing Letter).  According to Timo, "[t]he family had made a tactical decision that, for a variety of reasons, it would be better to include the value of the [Tiffany] artwork in the taxable estate in my father's federal estate tax return to avoid an audit and the consequences of an audit, including substantial legal fees."  Timo Tr. at 129:20–130:2, 207:12–17.

### 3.  *Sales of other Tiffany Art*

There have been three public auctions at which Tiffany artwork owned by Henry were put up for sale, none of which included the two Paintings.  One auction was held by Sotheby's on December 15, 2012 and each painting included the following provenance:  "Louis Comfort Tiffany, New York … By descent to Louise Collier Platt, granddaughter of the artist … By descent to her son, Henry Platt, circa 1980s … Acquired from the above by the present owner."  Doc. 151-1 at 4–5 (Sotheby's New York December 15, 2012 Catalogue).  Another public auction was held by Christie's auction house on December 9, 2014 with the following provenance on a Tiffany painting owned by Henry:  "Henry Platt, great grandson of Louis Comfort Tiffany … Ms. Thorunn Wathne … Acquired directly from the above by the present owner."  Doc. 152-1 at 4 (Christie's December 9, 2014 Catalogue).  Lastly, a public auction was held by Bonhams on June 10, 2014, which included seven Tiffany glass lots sold by Henry.  The description on the art stated that it was "Property Belonging to Henry B. Platt, Great-Grandson of Louis Comfort

Tiffany"[20] and had the following provenance:  "Louise Comfort Tiffany … Mary Tiffany Lusk

[Tiffany's daughter] … Louise Lusk Platt."  Doc. 153-1 at 2–7 (Christie's December 9, 2014

Catalogue).

Gordon testified that he was "aware that Tiffany artwork has sold at auction over the

years" but that he "was not aware of any Tiffany artwork selling that was part of the family's

ownership."  Gordon Tr. at 83:6–10.  Gordon did not take any steps beyond "looking at

photographs" of the works to see if he recognized the artwork to ascertain whether the Tiffany

art he saw being sold was subject to the anti-alienation restriction.  *Id.* at 83:15–21.  Gordon also

testified that other family members were also aware of the public auctions of Tiffany art over the

years.  *Id.* at 88:6–10.  The family members did not put any auction house on notice of an anti-

alienation restriction concerning the Tiffany works being put up for sale prior to 2018.  *Id.* at

88:24–89:4.

### 4. *The Trust*

Plaintiffs maintain that the Trust, which was established on March 18, 2018—before

Plaintiffs or anyone in the Platt family knew that Michaan had acquired the Paintings—was

established to document the Platt family's continued ownership and custody of all the Tiffany

paintings and other works of art, including the two Paintings.  Timo Decl. ¶ 22.  Additionally,

Plaintiffs allege that the Trust's ownership was based on the their understanding that the

Paintings (1) belonged to the Platt family and not to any individual family member, (2) would

remain in the Platt family, and (3) would not be sold or transferred outside of the family.

Plaintiffs take the position that the Trust's ownership of Tiffany paintings commenced

"when all signatures [of the settlors] applied to the Trust" because an affiliation that Plaintiffs

---

[20] One of the pieces, number 53, noted that it was "Property of various owners."  Doc. 153-1 at 2.

refer to as "[t]he Platt family as a whole" or "[t]he Platt family, as a collective" owned the

Tiffany art prior to the Trust's formation in 2018.  Gordon Tr. at 50:2–54:8, 77:22–24, 106:15–

18.  In other words, Gordon alleges that the members of the Trust owned the Paintings, and upon

signing the Trust, gave the Trust ownership rights to the Paintings.  *Id.* at 106:22–24.  In part, the

Trust states:

> Thomas Platt, Henry Platt and Graham Platt … had the express understanding,
> intention and agreed upon restriction that the Tiffany Artwork should always
> remain in the ownership, control and custody of lineal blood descendants of
> [Charles Tiffany] and [Louis Comfort Tiffany] … the Settlors desire to abide this
> express intention, understanding and agreed-upon restriction with respect to the
> Tiffany Artwork … 2(c) Each Settlor hereby irrevocably grants, conveys and
> assigns to the Trust any and all of his right, title and interest in each and all items
> of Trust Art … 2(d) The Settlors hereby acknowledge and agree that the Trust
> hereby is the exclusive owner of all items of Trust Art.

Doc. 149-52 at 3–4 (Platt Family Artwork Trust Agreement).

The settlors are the Estate of Thomas C Platt, Jr., Byrd S Platt, The Platt Family Trust of

New York, Ann-Byrd Platt, Charles Platt, Timo Platt, Elizabeth Louise Platt, Christina May

Nelson, and Gordon Lethbridge Platt.  *Id.* at 2.  The individual settlors are "descendants and

grandchildren of Louise … granddaughter of Louis Comfort Tiffany."  *Id.*  Thomas' children are

Ann-Byrd, Charles, Elizabeth Louise, and Timo; Graham's children are Gordon and Christina.

*Id.* at 4.  Plaintiffs admit that the Trust holds no assets, has no bank accounts, files no taxes and

has no taxpayer ID, has no independent address, is not on file with any secretary of state, has no

registered agent, and neither owns nor rents any storage or warehouse space for any art.  Timo

Tr. at 40:21–24; Gordon Tr. at 158:8–159:25, 168:11–15.

Not all surviving members of the Platt family are settlors of the Trust.  For example,

Gordon's brother, Graham Leghe, refused to sign the Trust because he believed he was and

should be able to sell the Tiffany art that his father left him.  Gordon Tr. at 96:10–97:23, 99:11–

101:17.  Gordon alleges that Graham Leghe has not been competent since 2020 and Timo alleges that Graham Leghe was not competent at the time the Trust was formed.  Gordon Tr. at 89:13–23; Timo Tr. at 51:7–13.  Graham Leghe has not been declared incompetent by any authority or been assigned a guardian, and he lives alone.  Gordon Tr. at 91:12–16, 21–24.

Plaintiffs' position is that the settlors of the Trust collectively owned the Tiffany art, which is now owned by the Trust.  Timo Decl. ¶ 38; Gordon Decl. ¶ 8.  However, in 2019, Plaintiffs arranged for an amendment to the Trust that purports to approve their personal "ownership" of the Paintings if they prevail in this litigation.  Doc. 149-55 at 2 (Trust Agreement and Amendment) ("The Trustees, on behalf of the Trust, are authorized to sell to … Gordon Platt and Timo Platt… 'The Paintings'… and [] the rights to recover The Paintings in the pending federal court litigation[.]").  The Trust amendment does not state that ownership of the Paintings would revert back to the Trust upon Plaintiffs' death.  However, Gordon maintains that "the family's understanding of the anti-transfer restriction of the artwork that precedes the Trust" is sufficient for the family to reinstate the Paintings in the Trust and that ownership and custody of the Paintings would be governed by the Trust upon the death of the Plaintiffs.  Gordon Tr. at 155:7–10.

## B.  Procedural background

On May 9, 2019, Plaintiffs filed the instant complaint, asserting two claims for replevin, one claim for conversion and a claim for declaratory judgment, all concerning the Paintings.  Doc. 1.  On August 30, 2019, Michaan moved to dismiss all claims.  Doc. 20.  On November 7, 2019, the Court entered a stipulation allowing the withdrawal of Charles C. Platt of Wilmer Cutler Pickering Hale and Dorr LLP as counsel for the Trust, thus leaving the Trustees to represent themselves *pro se* as of that date.  Doc. 31.  The motion to dismiss motion was denied

on March 31, 2020.  Doc. 35; *see also Platt v. Michaan,* 459 F. Supp. 3d 553 (S.D.N.Y. 2020)

("*Platt I*").

On March 26, 2021, Michaan submitted a letter motion to the Court to stay the

proceedings until the Trust acquired new counsel, arguing that the Trustees could not appear *pro

se* on behalf of the Trust.  Doc. 42.  On March 30, 2021, Michaan brought a counterclaim against

Plaintiffs and a third-party complaint against the Estate of Henry B. Platt, by John Doe 1 as

Administrator, Thorunn Wathne, Timo Platt and Gordon Platt, as co-trustees of the Platt Family

Artwork Trust, and John Does 2-25.  Doc. 44.

On April 5, 2021, the Court directed Plaintiffs to retain counsel to represent the Trust in

the case, as trusts may not proceed *pro se.*  Doc. 48.  On April 15, 2021, the Trustees submitted a

letter requesting reconsideration of the Court's April 5, 2021 Order.  Doc. 49.  The Trustees

argued that they do not have the financial means to retain counsel.  *Id.*  On April 22, 2021, the

Court denied the motion for reconsideration.  Doc. 54.  Trustees retained counsel on May 17,

2021, Doc. 57, and filed their answer to the counterclaims and third-party complaint on June 1,

2021.  Doc. 61.

Pursuant to a pre-motion conference held on January 4, 2022, the Trustees moved the

Court to substitute Timo and Gordon—in their individual capacities—in place of the Trustees as

plaintiffs in this action, pursuant to FRCP 25(c).  Doc. 87.  On June 9, 2022, the Court granted

the motion such that Timo and Gordon as individuals were substituted for the Trustees as

plaintiffs in this action.[21]  Doc. 102.  Plaintiffs have proceeded *pro se* since that date.  By

stipulation dated November 22, 2022, the parties stipulated that Michaan would dismiss all of his

---

[21] The Trustees explained that on December 21, 2021, the Platts bought from the Trustees all of the Trust's rights, title, and interest in the paintings, including the two Paintings.  Doc. 102 at 3.

counterclaims.  Doc. 134.  And on December 2, 2022, Michaan voluntarily dropped the third-party claims against third-party defendants Wathne and the Trustees.  Doc. 143.

On December 30, 2022, Michaan moved for summary judgment to dismiss the complaint in its entirety, Doc. 147, and on February 1, 2023, Plaintiffs cross-moved for partial summary judgment on their first replevin claim.  Doc. 157.

## II.   LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Senno v. Elmsford Union Free Sch. Dist*., 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (*citing SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  A fact is "material" if it might affect the outcome of the litigation under the governing law.  *Id.*  The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *Saenger v. Montefiore Med. Ctr*., 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (internal quotation marks omitted) (citing *Jaramillo v. Weyerhaeuser Co*., 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod v. Omya, Inc*., 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp*., 368 F.3d 123, 126 (2d Cir. 2004)).  However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported

assertions, conjecture or surmise. *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

"It is well established that the submissions of a *pro se* litigant must be construed liberally and interpreted to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks and emphasis omitted), including when facing a summary judgment motion, *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). Nevertheless, the "application of this different standard does not relieve plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Id.* at 50 (internal quotation marks omitted).

"When confronted with cross-motions for summary judgment, the Court analyzes each motion separately, 'in each case construing the evidence in the light most favorable to the non-moving party.'" *Peterson v. Kolodin*, No. 13 Civ. 793 (JSR), 2013 WL 5226114, at *1 (S.D.N.Y. Sept. 10, 2013) (quoting *Novella v. Westchester Cty.*, 661 F.3d 128, 139 (2d Cir. 2011)); *see also Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.") (citation omitted). The Court is not required to resolve the case on summary judgment merely because all parties move for summary judgment. *Morales*, 249 F.3d at 121.

### III.   DISCUSSION

Michaan moves for summary judgment on three grounds:  (1) there is no admissible evidence to support the establishment of the anti-alienation restriction; (2) Plaintiffs have failed to demonstrate that the Trust has property ownership rights over the Paintings; and (3) substantively, the claims should be barred on the basis of laches, tax and judicial estoppel, and the New York rule against perpetuities.  Plaintiffs cross-move for partial summary judgment on the first claim for replevin.

 In order to state a prima facie case for replevin under New York law, Plaintiffs are required to plead either ownership of, or a superior right to the Paintings.  Accordingly, the parties' dispute here centers on one issue:  the nature of Henry's possession of the Paintings at the time he sold them to Michaan.  Specifically, whether at the time of the sale, Henry lacked title to the Paintings because he was bound by an anti-alienation restriction, such that he could not sell the Paintings outside of the Platt family.  Consequently, to survive summary judgment, Michaan must prove that there is no genuine dispute that there is *no* anti-alienation restriction on the two Paintings; likewise, Plaintiffs must prove that there is no genuine dispute that there *is* an anti-alienation restriction on the two Paintings.

The Court finds that there is a genuine dispute regarding the existence of the anti-alienation restriction.  Accordingly, both the Plaintiffs' and Michaan's motions for summary judgment must be denied on that ground.  Nonetheless, the Court finds that Plaintiffs' claims are barred by the doctrines of tax estoppel, judicial estoppel, and laches.  Therefore, Michaan's motion for summary judgment is granted.

### A.  The Anti-Alienation Restriction

In support of their argument that there did exist an anti-alienation restriction, Plaintiffs proffer four sources of evidence:  (1) the unsigned 1994 Letter drafted by Thomas to his

brothers, Henry and Graham.  Doc. 162-3; (2) witness testimony from Frelinghuysen, the

Curator of American Decorative Arts at the Met, and Hurst, Henry's financial advisor; (3) the

2018 Trust, which Plaintiffs argue confirmed continued ownership and custody by the Platt

family; and (4) their "understanding" from "their personal knowledge … which derived from

their observations of repeated, continuous and uniform conduct, experience and statements by

the Platt family for over 40 years."  Doc. 163 at 6.

Michaan argues that Plaintiffs lack admissible evidence to support their claims and that

on this basis he should be granted summary judgment.  Specifically, he argues that Thomas'

1994 Letter, witness testimony from Frelinghuysen and Hurst, and statements from deceased

members of the Platt family are "unauthenticated hearsay and hearsay within hearsay," as well as

"incompetent and unreliable hearsay and unauthenticated documents."  Doc. 148 at 7, 24.

Additionally, Michaan argues that the statements from the deceased Platt family members are

barred by New York's so-called "Dead Man's Statute."  Finally, Michaan argues that no hearsay

exception could apply to any testimony outlined above "given the lack of circumstantial

guarantees of trustworthiness."  Doc. 168 at 13.

### 1.  *Authenticity of the 1994 Letter*

Authenticity is a condition precedent to admissibility.  The bar for authentication of

evidence is not particularly high.  *United States v. Dhinsa*, 243 F.3d 635, 658 (2d Cir. 2001).

The requirement of authentication is satisfied by evidence sufficient to support a finding that the

matter in question is what its proponent claims.  Fed. R. Evid. 901(a).  The rule is flexible about

what serves to authenticate a document.  For example, direct testimony by a knowledgeable

witness satisfies the rule.  *See* Fed. R. Evid. 901(b)(1).  A party could also satisfy the

authentication requirement if the document's form and content, taken with other circumstances,

indicate that the document is reliable.  *See* Fed. R. Evid. 901(b)(4).  And for ancient documents[22] such as the 1994 Letter, evidence that it (1) is in a condition that creates no suspicion about its authenticity; (2) was in a place where, if authentic, it would likely be; *and* (3) is at least 20 years old when offered can satisfy the requirement.  Fed. R. Evid. 901(b)(8)(a)–(c) (emphasis added).

Generally, a document is properly authenticated if a reasonable juror could find in favor of authenticity.  *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004).  The Court finds that the 1994 Letter is admissible.

Unlike other letter communications on the record, the 1994 Letter is unsigned[23] and not on Thomas' United States District Court letterhead.  *Compare* Docs. 149-24, 149-26, 149-35 (letters written on Thomas' United States District Court letterhead in which Thomas discusses negatives for a photograph of Tiffany artwork with Duncan and sends Duncan two payments for Duncan's appraisal report of Louise's estate) *with* the 1994 Letter (Doc. 149-7).

Additionally, the 1994 Letter cannot be authenticated under Rule 901(b)(8) because it fails to meet two of the three conditions.  First, the lack of signature and letterhead on the letter creates "suspicion about its authenticity"; and secondly, Plaintiffs do not provide information on where the letter was found, thus they are unable to make the requisite finding that the document "was in a place where, if authentic it would likely be."  Fed. R. Evid. 901(b)(8)(a–b).

However, Timo testified that he has "personal knowledge" of the copy of the 1994 Letter: that it was prepared by his father Thomas in May 1994 following the death of Thomas' mother, Louise, in connection with the division of custody of the Tiffany paintings, including the

---

[22] An ancient document is a document that was prepared before January 1, 1998, and whose authenticity is established.  Fed. R. Evid. 803(16).

[23] Timo stated that the 1994 Letter was created using carbon paper in a manual typewriter, and that the carbon copy was not signed because that was "the ordinary practice at the time."  Timo Decl. ¶ 14.

Paintings.  Timo Decl. ¶ 13.  He also stated that the letter was created using carbon paper in a manual typewriter, that he read the letter in 1994, that it is a duplicate of the original sent by Thomas, and that it was sent to and received by Henry and Graham.  ¶¶ 14–15.

Accordingly, the Court finds that the 1994 Letter meets the low bar of authentication under Fed. R. Evid. 901(a).

### 2.  Admissibility of Plaintiff's Evidence

As to its admissibility, the 1994 Letter falls under a recognized hearsay exception and is therefore admissible.  An out-of-court statement offered to prove the truth of the matter asserted is inadmissible hearsay pursuant to Fed. R. Evid. 801 unless there is a hearsay exclusion or exception under Rules 801(d) or 803.  Plaintiffs contend that the Letter is "contemporaneous written evidence of the Platt brothers' beliefs and state of mind with respect to the restrictions on transferring the two Paintings *and* the Platt family ownership of the Paintings more generally … and … admissible evidence of the three sons' agreement with respect to the two Paintings." Doc. 163 at 22 (emphasis in original).  Plaintiffs cite no case law for this argument.  Under Fed. R. Evid. 803(3), a statement of the declarant's then-existing state of mind is a hearsay exception. Further, a declarant's statement of his intent "may be introduced to prove that the declarant thereafter acted in accordance with the stated intent."  *United States v. Best*, 219 F.3d 192, 198 (2d Cir. 2000), *cert. denied*, 532 U.S. 1007 (2001).

However, the Advisory Committee Notes on the adoption of Rule 803(3) state that "the Committee intends that the Rule be construed to limit the doctrine of *Mutual Life Insurance Co. v. Hillmon*, 145 U.S. 285, 295–300 (1892) so as to render statements of intent by a declarant admissible only to prove *his* future conduct, *not the future conduct of another person*."  Fed. R. Evid. 803 Advisory Committee Note (1974) (emphasis added).  *See Best*, 219 F.3d at 198

(holding that admissibility about the future conduct of a person other than the declarant turned on whether there was independent evidence that connected the declarant's statement with the non-declarant's activities) (collecting cases).

In the instant case—the intent to move forward with the anti-alienation restriction—can only be inferred of the declarant, Thomas.  Thus, the 1994 Letter is admissible only insofar as it relates to Thomas' state of mind and intention, but not as evidence of any *agreement* with respect to the two Paintings, as there is no record of Henry or Graham accepting the anti-alienation restriction proposed in the 1994 Letter.

As to the testimony of the Frelinghuysen and Hurst, the Court finds that this is inadmissible hearsay.  Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered in evidence to prove the truth of the matter asserted*." Fed. R. Evid. 801(c) (emphasis added).  Frelinghuysen testified that in 1998 Henry told her he could not donate one of the Paintings to the Met "because it always had to stay in the family." Frelinghuysen Tr. at 30:16–24.  Hurst testified that Henry told him that "those two [P]aintings that were in the apartment … are to remain with his family" and that "Platt told me he couldn't sell those paintings."  Hurst Tr. at 60:23–61:3.  These statements are offered for the truth of the matter asserted—i.e., that there *was* an anti-alienation restriction.  *See* Doc. 163 at 19 ("[T]he compelling testimony of … []Frelinghuysen and Hurst[] confirm[] that the two Paintings could never be transferred outside the Platt family.").

No hearsay exception applies to the testimony of these two witnesses.  The evidence proffered by a party in opposition to a motion for summary judgment must be admissible at trial. *See, e.g., Caputo v. Pfizer, Inc.*, 267 F.3d 181, 188 (2d Cir. 2001) (stating that summary judgment is appropriate only if admissible evidence establishes that there is no genuine issue of

material fact); *Debrosse v. City of New York*, 739 F. Appx 48, 50 (2d Cir. 2018) ("Nor does any of the inadmissible hearsay deposition testimony ... defeat summary judgment, since the court may consider only admissible evidence.").  Accordingly, the Court will not consider the testimony of Frelinghuysen or Hurst.

Lastly, the Court finds that the oral statements attributed to Tiffany, Louise, Henry, Graham, and Thomas that form the basis of Plaintiffs' "understanding" are inadmissible hearsay. Timo testified that his grandmother Louise had this understanding based on conversations with her grandfather and mother, and that the idea originated with her grandfather, Tiffany.  Timo Tr. at 48:20–49:18.  Gordon testified that he has had this understanding through conversations with his grandmother, Louise, his father Graham, as well as uncles, grandparents, cousins, and siblings.  Gordon Tr. at 22:7–23:19.

Timo's testimony is inadmissible hearsay within hearsay.  Fed. R. Evid. 805.  "Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule."  *Id.*  The first hearsay statement is Louise's alleged conversation with her grandfather Tiffany about the anti-alienation restriction. This statement does not fall under any exception to the hearsay rule.  Because one part of the statement is inadmissible hearsay, the entire statement is inadmissible hearsay.  The statement is only admissible if *each* part falls within an exception or exclusion to the hearsay rule.  *Id.*; *see Gueye v. People's United Bank, Nat'l Ass'n*, No. 18 Civ. 5961 (ENV) (RER), 2021 WL 10351963, at *6 (E.D.N.Y. Apr. 9, 2021), *aff'd*, 2022 WL 2203953 (2d Cir. June 21, 2022) (emphasis added).

Similarly, Gordon's testimony is also hearsay that does not fall within any of the hearsay exceptions.  Thus, the Court will not consider either statement for summary judgment.  A party

"cannot rely on inadmissible hearsay in opposing a motion for summary judgment ... absent a showing that admissible evidence will be available at trial." *Abdel-Karim v. EgyptAir Airlines*, 116 F. Supp. 3d 389, 409 (S.D.N.Y. 2015), *aff'd sub nom. Abdel-Karim v. Egyptair Holding Co.*, 649 F. App'x 5 (2d Cir. 2016) (quoting *Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (internal citations omitted).

Michaan also argues that under New York's so-called "Dead Man's Statute," the statements Plaintiffs rely upon that were made by people who are now deceased are inadmissible. N.Y. C.P.L.R. 4519. The Dead Man's Statute precludes interested parties from testifying on their own behalf against the interest of a decedent as to conversations or transactions that they had with a person that is now dead. *Endervelt v. Slade*, 162 Misc. 2d 975, 978, (Sup. Ct. 1994), *aff'd*, 214 A.D.2d 456, (1995). The statute is grounded "on the concept that where death has sealed the lips of one of the parties to a personal transaction, the law, for the protection of his estate and his survivors, should and ought to seal the lips of anyone else making a claim against the estate." *Ward v. Kovacs*, 55 A.D.2d 391, 403, (2d Dept. 1977).

New York's Dead Man's Statute makes testimony by an interested witness "concerning a personal transaction or communication between the witness and the deceased" excludable only "[u]pon the trial of an action or the hearing upon the merits of a special proceeding." *Phillips v. Kantor & Co.*, 31 NY2d 307 (1972) (quoting N.Y. C.P.L.R. 4519). The Dead Man's Statute applies, under its plain language, "[u]pon the trial of an action," and under New York practice, the statute may not be asserted to exclude evidence used in opposition to a motion for summary judgment. *See Clark v. Meyer*, 188 F. Supp. 2d 416, 420–21 (S.D.N.Y. 2002) (citations omitted). However, the evidence submitted on a motion for summary judgment "must set forth facts that would be admissible in evidence if offered at trial. Thus, irrespective of how New

York might decide this question, the federal rule requires exclusion of evidence on summary judgment motions which the dead man's statute would exclude at trial." *Abraham v. Leigh*, 471 F. Supp. 3d 540, 556 (S.D.N.Y. 2020) (quoting *Pro Bono Invs., Inc. v. Gerry*, No. 03 Civ. 4347 (JGK), 2005 WL 2429777, at *6 (S.D.N.Y. Sept. 30, 2005).

The Court finds that the Dead Man's Statute makes Plaintiff's "understandings" based on the statements of deceased Platt members inadmissible. Plaintiffs' arguments that rely on *Murray v. Smith*, 155 A.D.2d 963 (1989) and *Smith v. Kuhn*, 221 A.D.2d 620 (1995) are misguided. In *Murray*, the Court held that it was proper to permit respondent to testify about a conversation with the deceased individual because there was no showing that the declarant was "a person interested in the event." *Murray v. Smith*, 155 A.D.2d 963, 963 (1989). Likewise, in *Smith*, the Court found that the testimony was not barred by the Dead Man's Statute because the witness was not a person "interested in the event." *Smith v. Kuhn*, 221 A.D.2d 620, 621 (1995). "The test of interest of witness is whether witness will gain or lose by direct legal operation and effect of judgment or that record will be legal evidence for or against witness in some other action." *Id.* Because the Plaintiffs will gain or lose ownership in the Paintings by the outcome of the judgment, they are interested witnesses.

Accordingly, the Court will consider only the 1994 Letter, and not the testimony of Frelinghuysen and Hurst, or the Plaintiffs' "understandings" based on statements by deceased members of the Platt family, as evidence of the existence of the anti-alienation restriction.

### 3. *Admissibility of Michaan's Evidence*

Michaan relies on the following evidence to argue that individual Platt family members (including Henry) owned Tiffany artwork, and not the Platt family collectively: the wills for Louise, Thomas, and Graham; Thomas, Timo, and Charles' representation of their individual

ownership of other particular objects of Tiffany artwork to taxing authorities; Christina's representations of ownership to the Oregon Court; and the auction catalogues which featured the sale of other Tiffany works of art without objection by any member of the Platt family. Plaintiffs, in turn, argue that the wills, the tax documents, and the auction catalogues are inadmissible hearsay.

Louise's will reflects that she passed on "all [her] tangible personal property," with no specific mention of Tiffany artwork. Doc. 149-8. However, the 1994 Letter reflects that Louise's three sons inherited the Tiffany artwork as part of Louise's will ("Harry has expressed to me a preference for at least two, if not more, Tiffany paintings [the Nuremberg and the Algiers."]). Doc. 162-3. Thus, it is undisputed that Thomas, Graham, and Henry inherited the Tiffany artwork. Subsequently, Thomas' will bequeathed "all of [his] … paintings and other objects of art" to his children if his wife did not survive him. Doc. 149-39 at 2. Thus, through the wills of Louise and Thomas, there were individuals in the Platt family who purported to own particular Tiffany artwork. Further, the facts on the record show that Thomas, Graham, and Christina represented to tax authorities, appraisers, and insurers that they individually owned Tiffany works of art and that Timo and Charles represented to an appraiser that their father, Thomas, individually owned the Tiffany art in his estate. Plaintiffs' argument that "these representations were made for the purpose of avoiding … expensive estate tax proceedings," is of no moment.[24] Lastly, the three auction catalogues listed Henry as the individual owner of Tiffany artwork.

---

[24] As discussed *infra,* under the doctrine of tax estoppel, a party to litigation may not take a position contrary to a position taken in an income tax return.

Plaintiffs' hearsay arguments regarding these documents fail.  First, Plaintiffs do not dispute that the wills are authentic.  *See* Timo Tr. at 60:14–20, 171:19–172:8 (acknowledging exhibits as the wills of his father, Thomas and grandmother, Louise); Gordon Tr. at 62:10–16 (acknowledging an exhibit as Graham's will).  Further, the executors and beneficiaries acted in accordance with their terms with respect to bequests and interests in property.  The wills are thus admissible under Fed. R. Evid. 803(15).  *See, e.g.*, *Butler v. Suria*, No. 17 Civ. 3077 (KPF), 2019 WL 13217243, at *1 (S.D.N.Y. Oct. 10, 2019) (finding divorce decree affecting interest in property admissible under Rule 803(15) because it was "executed in relation to serious and carefully planned transactions, and the financial stake in the transaction, plus the obvious reliance upon the truth of statements made in such instruments by third parties are adequate to at least imply that the recitals in such instruments are trustworthy.") (internal quotations omitted).  In any event, Louise's and Thomas' wills were executed in 1982 and 1996, respectively, and authenticated, making them admissible as ancient documents.  *See* Fed. R. Evid. 803(16) ("a statement in a document that was prepared before January 1, 1998, and whose authenticity is established … is not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness").

Regarding Louise's Estate Tax Returns signed by Thomas in 1994, these documents are admissible under Fed. R. Evid. 803(16) as ancient documents.[25]  Doc. 149-11.  And the auction catalogues are admissible under Fed. R. Evid. 803(6) as business records.  *See* Docs. 151–53 (sworn declarations of record keepers at Sotheby's, Christie's, and Bonham's stating that "records are kept in the normal course of … business.").  Business records are considered reliable, in part, because businesses rely upon them, or the person making the record has a duty

---

[25] The Court addresses the tax documents and representations made by Christina in the "Tax estoppel" section, *infra*.

to make an accurate record as part of an occupation.  *See* Fed. R. Evid. 803 Notes of Advisory

Committee.  Additionally, the catalogues are admissible under Fed. R. Evid. 803(17) as market

compilations.  *See* Fed. R. Evid. 803(17).  Market compilations are considered trustworthy

because of the "general reliance by the public or by a particular segment of it, and the motivation

of the compiler to foster reliance by being accurate."  *See* Fed. R. Evid. 803 Notes of Advisory

Committee; *see also See King v. Wang*, No. 14 Civ. 7694 (LJL), 2021 WL 5232454, at \*13–15

(S.D.N.Y. Nov. 9, 2021) (admitting auction reports as market compilations).  Thus, the Court

accepts the catalogues as evidence that Henry did sell Tiffany artwork at auction.

4. *There is a Genuine Dispute of Material Fact Regarding the Existence of the Anti-Alienation Restriction*

Michaan argues that—at best—the 1994 Letter proposes an anti-alienation agreement

between Thomas and his two brothers, Henry and Graham.  Doc. 148 at 11.  The 1994 Letter

states, in relevant part,

> [Henry] has expressed to me a preference for at least two, if not more, Tiffany
> paintings (the Nuremberg and the Algiers). I think *if we are going to agree* upon
> preferences of this sort, *we are going to have to make the preferences, subject to
> anti-alienation agreements* to any person outside of an immediate family member
> both during life and at death, i.e. restrict them to life estates with the redivision
> being made to present members of the class surviving the termination of the life
> estate. *Absent such agreements … I will in my absolute discretion [to divide
> Louise's tangible personal property], determine the division [of Tiffany's
> paintings]…. Hoping you agree.*

Doc. 162-3 (1994 Letter) (emphasis added).  There is no record of a written response to the

letter, and thus no confirmation on the record of whether Graham and Henry agreed to an anti-

alienation restriction.

 In response, Plaintiffs argue that Thomas' use of the words "if we are going to agree"

and "hoping you agree" in the 1994 Letter are subject to the controlling statement that "absent

such agreements … I will, in my absolute discretion, determine the division" of custody of the

Paintings.  Doc. 163 at 15.  Indeed, Gordon testified during his deposition that the 1994 Letter reflects that, "if [Henry, Graham and Thomas] did not agree to the anti-alienation restriction, that my uncle Tom would exclusively decide what was to be done with the artwork."  Gordon Tr. at 46:17–25.  Plaintiffs argue that the language makes it clear that, if one or more of the brothers did not agree to the terms in the 1994 Letter, Thomas would have the absolute discretion to allocate the Paintings equally to all, and that Henry's acceptance of the Paintings therefore constituted an agreement to anti-alienation provision.  Doc. 163 at 15.

Based on the record, there is a genuine dispute of material fact as to whether Henry agreed to an anti-alienation restriction.  Because there is no record of a response to the 1994 Letter, there is no confirmation that Henry agreed to the anti-alienation restriction.  Certainly, as Gordon testified, if Henry had not agreed to the anti-alienation restriction, Thomas would have decided what was to be done with the artwork.  Gordon Tr. at 46:17–25.  This includes the possibility of Thomas dividing the artwork without the anti-alienation restriction.

However, a jury could agree with Plaintiffs that the 1994 Letter supports the contention that Henry only took custody of the Paintings subject to anti-alienation restrictions.  Thus, Michaan's arguments for summary judgment as to this point must fail.  As the Court held in *Platt I*, "Michaan's contention is based on his own alternative interpretation of the [1994] Letter that, at best, *creates issues of fact*."  *Platt I* at 559 (emphasis added).  The fuller record available at this juncture does not resolve the factual dispute.

*          *          *

In summary, as Michaan correctly argues, the greater part of the admissible evidence in the record—including the wills of Louise, Henry, Thomas, and Graham—do not support the existence of an anti-alienation agreement, only the 1994 Letter does.  And the letter itself is

33

arguably open to different interpretations.  But it is not the role of the Court to favor one interpretation over the other on summary judgment.  Moreover, the admissible documentary record suggests that, after Louise's death, *no* Platt family member acted in accordance with the belief that there existed an anti-alienation restriction.  For instance:  after her death, Thomas and Graham retained Duncan to appraise Louise's art, including the Paintings, and then Thomas, as her executor, represented to the Internal Revenue Service ("IRS"), that Louise "owned … Tiffany … works of art, as appraised by [Duncan];" Henry explicitly repudiated any anti-alienation restriction in his February 2008 Letter; Gordon and other Platt family members took no action upon learning of three auctions in which Tiffany artwork was sold; and crucially, Platt family members repeatedly claimed individual ownership of Tiffany artwork in tax documents and judicial proceedings as discussed below.

### B.  Estoppel

Thomas, Timo, Graham, and Christina made several prior representations on tax documents and before judicial authorities regarding Tiffany artwork that contradict Plaintiffs' instant claims that the two Paintings passed outside of the Platt estates and that the Trust has property ownership over the Tiffany artwork.  Accordingly, the Court finds that Plaintiffs' claims are barred by tax estoppel and judicial estoppel.

#### 1.  Tax estoppel

Under the doctrine of tax estoppel, "a party to litigation may not take a position contrary to a position taken in an income tax return."  *Mahoney-Buntzman v. Buntzman*, 12 N.Y.3d 415, 422 (2009).  It is undisputed that Timo represented on tax documents that Louise's and Thomas' estate "owned" the Tiffany art that each decedent possessed at the times of their deaths.  According to Plaintiffs, this was done to avoid estate tax proceedings with the IRS.  It is also

undisputed that these representations are inconsistent with the litigation position Plaintiffs take in the instant case. Doc. 156 ¶ 51 ("Plaintiffs take the position in this litigation that Tiffany artwork 'passed outside' Thomas Platt's estate even though, for tactical reasons, they stipulated that the artwork could be considered as part of the Estate to avoid expensive and lengthy disputes with federal and state tax authorities.").

However, the doctrine of tax estoppel is only applicable when "the party seeking to contradict the factual statements as to ownership in the tax returns *signed the tax returns, and has failed to assert any basis for not crediting the statements*." *PH-105 Realty Corp v. Elayaan*, 183 A.D.3d 492 (2020) (emphasis added). Thus, only the representations made by Timo or Gordon Platt will be analyzed.

It is undisputed that Timo, in his role as co-executor of Thomas' estate, represented to the IRS and The New York Department of Taxation and Finance that Thomas owned the Tiffany art he had received from Louise's bequest. Doc. 149-41 at 28 (Thomas Platt Estate federal tax filing listing "artwork" under "other miscellaneous property"); Doc. 149-42 (New York State Estate Tax Closing Letter). Plaintiffs argue that the doctrine of tax estoppel is inapplicable because they *have* asserted a "basis for not crediting the statement." *PH-105 Realty Corp,* 183 A.D.3d 492. The basis Plaintiffs assert is that the representation was made to avoid costly and lengthy estate tax proceedings with the IRS and other tax authorities.[26] The Court finds that Plaintiffs' basis for why the statements on the tax filings contradict their allegation that the two Paintings

---

[26] Plaintiffs inexplicably rely on *Matter of Seaman* for support. In *Matter of Seaman*, the court held that the appellant (the widow of the decedent) was not estopped from claiming ownership of the property at issue—a china collection—because the china was not listed on the decedent's estate tax failing ("no inventory of or reference to the china collection is found in the papers on file"). *Matter of Seaman*, 275 A.D. 484, 489 (App. Div. 1949), *aff'd*, 300 N.Y. 756, 92 (1950). The opposite is true in the instant case: the Tiffany artwork was explicitly listed in Thomas' estate filing.

"passed outside" of Thomas' estate is unavailing.  Indeed, Timo's admission as to the reason

they represented to tax authorities that Thomas owned the Tiffany art in his estate is the *very*

reason the doctrine of tax estoppel exists:  to prevent parties from taking inconsistent and

situationally expedient positions on matters on which they are required to be truthful.  *See Matter*

*of Ansonia Assocs. L.P. Unwin*, 130 A.D.3d 453, 454 (1st Dep't 2015) (applying tax estoppel

where party's allegations were "logically incompatible with the position she asserted on her tax

returns"); *see also Zemel v. Horowitz*, 11 Misc. 3d 1058(A), 2006 N.Y. Slip Op. 50276(U), at *4

(Sup. Ct. N.Y. Cnty. Mar. 2, 2006) (dismissing a claim on summary judgment applying estoppel

where "plaintiffs avoided paying a significant sum in income taxes" by misrepresenting a

transaction to the IRS).  Simply stated, courts "cannot, as a matter of policy, permit parties to

assert positions in legal proceedings that are contrary to declarations made under the penalty of

perjury on income tax returns."  *Mahoney-Buntzman*, 12 N.Y.3d at 422.

### 2. *Judicial estoppel*

Likewise, under the doctrine of judicial estoppel, a party who takes a certain position in a

legal proceeding may not assume a contrary position in a subsequent legal proceeding because its

interests have changed.  *Lia v. Saporta*, 541 F. App'x 71, 73 (2d Cir. 2013).  *See also DeRosa v.*

*Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) (holding that judicial estoppel will

generally apply if (1) a "party's later position is clearly inconsistent with its earlier position," (2)

the former position was "adopted in some way by the court in the earlier proceeding," and (3) the

"party asserting the two positions would derive an unfair advantage against the party seeking

estoppel" (internal quotation marks omitted)).

In November 2016, Christina, Graham's daughter, certified a complete inventory of all

property of Graham's estate in a filing before the Oregon Court.  Five Tiffany Paintings were

certified as Graham's personal property—not the property of the Platt family collectively.  In January 2018, the Oregon Court entered a general judgment approving a verified statement in lieu of final account filed by Christina, which outlined specific pieces of Tiffany art identified as "tangible personal property" of Graham's estate divided amongst each of Graham's three children, including Gordon.

Plaintiffs argue that because Christina is not a party in *this* action, judicial estoppel is inapplicable.  Plaintiffs are wrong, as "judicial estoppel applies [] to parties or their privies in a prior proceeding."  *Lia*, 541 F. App'x at 73.  Gordon was certainly privy to his father Graham's estate, as he benefitted from the Tiffany art that was passed to him via the Oregon Court's general judgment.  *See Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 1995) (explaining that the determination of whether a party is in privity with a former litigant requires courts to inquire whether the "party controlled or substantially participated in the control of the presentation on behalf of a party to the prior action" and that its interests were "identical to the interests" of the former litigant) (internal quotation marks and alterations omitted)); *see also Rojas v. Romanoff,* 186 A.D.3d 103, 111–12, (2020) ("the doctrine extends to persons who were not parties to the previous action but who were connected with it to such an extent that they are treated as if they were parties.").  Moreover, because judicial estoppel specifically exists to prevent such abuse, it is appropriate here, regardless of Plaintiffs' role (or lack thereof) in Christina's filing in the Oregon Court.  *See New Hampshire v. Maine*, 532 U.S. 742, 743 (2001) ("The purpose of the doctrine is to protect the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment.").

The Trust has no claim to the Paintings under the doctrine of judicial estoppel. Specifically, because Christina listed Tiffany artwork as Graham's personal property in the Oregon Court proceedings, the Trust is judicially estopped from now asserting ownership in the current proceeding. Plaintiffs' instant claim—that "Platt family, as a collective" owned the Tiffany art prior to the Trust's formation in 2018—is clearly inconsistent with the position Christina took in the Oregon Court proceeding.

Accordingly, the Court finds that Plaintiffs' claims that the Paintings passed outside of Thomas' estate and that the Trust has ownership of the Paintings are estopped and Michaan's motion for summary judgment is granted on this basis.

### C.  Laches

Finally, even if Plaintiffs were not estopped from pursuing their contradictory theory, Michaan's motion for summary judgment would be successful on the basis of laches.

Laches is an equitable defense that "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) (internal quotation marks and citation omitted). To prevail on a laches defense, in the context of missing or misappropriated art, Michaan must show that Plaintiffs were "aware of [their] claim" and "inexcusably delayed in taking action." *Howard Univ. v. Borders*, 588 F. Supp. 3d 457, 478–79 (S.D.N.Y. 2022) (quoting *Bakalar v. Vavra*, 819 F. Supp. 2d 293, 303 (S.D.N.Y. 2011), *on remand* from *Bakalar*, 619 F.3d 136). Michaan must also show that that he was prejudiced by the delay ("a party asserting the defense of laches has the burden" of showing that the defendant "has been prejudiced by the plaintiff's unreasonable delay in bringing the action."). *Id.* at 478.

*a.   Awareness and Unreasonable Delay*

The Court must first answer whether the undisputed evidence would require a jury to find whether Plaintiffs knew or should have known that they had a claim to the Paintings and whether they acted reasonably in light of that knowledge.  Plaintiffs can establish that there was not an unreasonable delay by showing that they engaged in a diligent search for the missing artwork during the period between when the two Paintings went missing (i.e., in 2011 when they were sold to Michaan) and the filing of the lawsuit (2019).  *See Solomon R. Guggenheim Foundation v. Mrs. Jules Lubell*, 77 N.Y.2d 311, 315–321 (N.Y. 1991).

"The opposing party need not have had actual knowledge of the claim; rather, it is sufficient that the opposing party *should have* known."  *Howard Univ.,* 588 F. Supp. 3d at 479 (emphasis added).  The Court finds that given the following, Plaintiffs should have known that they had a claim to the Paintings:  Plaintiffs' belief Henry was incompetent by 2008; Henry's 2008 Letter explicitly asserting his sole ownership of the Paintings he received from Louise; Henry's representation that he removed the two Paintings from his apartment; Thomas' expressed concerns about Wathne's undue influence regarding Henry's assets; the fact that Henry had sold other Tiffany art at three public auctions in 2012 and 2014; and Wathne's lack of response to Timo's repeated calls and emails in 2015 to ascertain what Tiffany art Henry still possessed at the time of his death.

By 2008, Plaintiffs and other members of the Platt family expressed concerns about Henry's competence.  Also in 2008, Timo and his father Thomas were concerned about the Tiffany art in Henry's possession in response to the 2008 Letter, where Henry wrote that he was "free to do with the paintings whatever [he] wants," and admitting that he "did take some paintings out of [his] apartment" because he "wanted to put them someplace where [Thomas]

could not steal them." Doc. 165-12; *see also* Timo Tr. at 198:4–25. Relatedly, by 2008 there were also concerns about Henry's longtime companion, Wathne. Timo testified that Thomas was concerned that Wathne "would object to being told … that the [anti-alienation] restrictions existed" with respect to Tiffany art, and that she might "force a confrontation over" the issue and that "'the family' [was] concerned that Thorunn [would] steal [Henry's] assets." *Id.* at 80:11–19; Doc. 165-12.

Moreover, in 2012 and in 2014, pieces of Tiffany artwork owned by Henry were put up for sale at three public auctions. Multiple members of the Platt family were aware of the auctions, including Gordon. Gordon Tr. at 88:6–10. In 2015, when Henry died, the Paintings "were not accounted for" and "were thought to be in the possession of" Wathne. Doc. 1 ¶ 15. Timo repeatedly called and emailed Wathne in 2015 to ascertain what Tiffany art Henry still possessed at the time of his death. These efforts to reach Wathne went unanswered. Despite the Plaintiffs' and the Platt family's misgivings about Henry's competence, and the resistance Thomas predicted Wathne would have to the anti-alienation restriction, other than Timo's unanswered calls to Wathne, neither Plaintiffs nor any member of the Platt family took any further action to determine whether the Paintings remained in Henry's possession at the time of his death. Instead, in 2019, when Plaintiffs were made aware of the sale of "Market Day at Nuremberg," Plaintiffs sent a demand letter to Michaan, asserting that an anti-alienation restriction was in place and demanding the artwork be returned.

In opposing summary judgment, Plaintiffs argue that this is because they did not know Michaan acquired the Paintings until 2019, and that as soon as they became aware of this, they filed their replevin claim. They argue that only three people, other than Henry and Wathne, knew about Michaan's purchase of the Paintings in 2011—Michaan, Duncan, and Krantz—and

Michaan kept the two Paintings in his home between 2011 and 2019.  Thus, Plaintiffs argue, they could not have known that the two Paintings were in Michaan's possession.

However, "[t]hese arguments … construe the laches inquiry too narrowly …. [Plaintiffs] need not have been aware of a claim against [Michaan] specifically; it is enough that they knew of—or *should have known* of—the circumstances giving rise to the claim …." *Bakalar*, 819 F. Supp. 2d at 304, *aff'd*, 500 F. App'x 6 (2d Cir. 2012) (emphasis added).  Further, the inquiry of delay "focuses not only on efforts by the party to the action, but also on efforts by the party's family." *Id.* at 3 (quoting *Bakalar v. Vavra*, No. 05 Civ. 3037 (WHP), 2006 WL 2311113, at *3 (S.D.N.Y. Aug. 10, 2006)); *see also Sanchez v. Trustees of the Univ. of Perm.*, 04 Civ. 1253 (JSR), 2005 WL 94847, at *2–3 (S.D.N.Y. Jan. 18, 2004) (considering lack of effort made by plaintiffs' father and grandfather).

Because Plaintiffs *and* their predecessors—including Thomas—knew or should have known of the circumstances giving rise to the claim by no later than Henry's death in 2015, the Court finds that there was an unreasonable delay.  *See Bakalar*, 819 F. Supp. 2d at 305 (applying laches, despite claimants' prompt action after learning of current owner's possession of art, and finding that "[claimants'] ancestors were aware of–or should have been aware of–their potential … rights to [] property and [claimants] are bound by the knowledge of their respective families.").

   *b.  Prejudice*

The resulting prejudice of Plaintiffs' delay is clear.  Plaintiffs' delay in pursuing their claim "makes it difficult to garner evidence to vindicate [Michaan's] ... rights." *Greek Orthodox Patriarchate of Jerusalem v. Christie's, Inc.*, No. 98 Civ. 7664 (KMW), 1999 WL 673347, at *10 (S.D.N.Y. Aug. 30, 1999).  The delay has resulted in "deceased witness[es] … [and] hearsay

testimony of questionable value." *Solomon R. Guggenheim Found. v. Lubell*, 153 A.D.2d 143, 149, (1990), *aff'd*, 77 N.Y.2d 311, 569 N.E.2d 426 (1991).  Plaintiffs' delay between the time they "should have known of the circumstances giving rise to the claim," certainly no later than 2011, and Henry Platt's death in 2015, has prejudiced Michaan because the key witness to the original sale of the Paintings, and the key witnesses to the purported existence of the anti-alienation agreement—Henry, Thomas, and Graham—cannot testify.  *See Bakalar* 819 F. Supp. 2d at 306 ("Of the greatest significance is the death of [the alleged thief], perhaps the only person who could have elucidated the manner in which she came to possess the Drawing, or indeed, whether she owned it at all."); *see also Sanchez,* 2005 WL 94847, at *1, 3 (finding that the long delay resulted in "making it extremely difficult for defendants to establish … that the collection was not stolen" because "the original parties to the … purchase are long deceased" and the only evidence offered was "inadmissible hearsay at best and rank speculation at worst.").

"When seeking summary judgment on the ground of laches, of course, a [party] must also show that there is no genuine issue of material fact about the delay or prejudice that would require a trial." *Serdarevic v. Advanced Med. Optics, Inc*., No. 06 Civ. 7107 (DLC), 2007 WL 2774177, at *6 (S.D.N.Y. Sept. 25, 2007), *aff'd*, 532 F.3d 1352 (Fed. Cir. 2008).  It is undisputed that neither Plaintiffs nor any member of the Platt family made any effort between 2011 and 2019 to assert their rights over the Paintings.  Lastly, Michaan was undisputedly prejudiced by this delay, as the most important witnesses are now deceased.  The Court finds that no genuine issue of material fact exists for any of these factors.

Accordingly, the Court dismisses Plaintiffs' claims as barred by the doctrine of laches and grants Michaan's motion for summary judgment.

## IV.    CONCLUSION

For the reasons set forth above, Plaintiffs' motion for partial summary judgment is

DENIED.  Michaan's motion for summary judgment is GRANTED.  The Clerk of Court is

respectfully directed to terminate the motions, Docs. 147 and 157, and close the case.

SO ORDERED.

Dated:    September 27, 2023
          New York, New York

_____
Edgardo Ramos, U.S.D.J.